Insurance to protect the contractor against claims arising from the operations of subcontractors. Any change in the insurance provided in accordance with this Section shall not be made until the Railroad has received ten (10) day's written notice thereof.

11. The Railroad agrees to waive any claim for its damages resulting from any changes of approach elevation which are caused by changes in minimum vertical clearances agreed to by the Railroad. The City shall indemnify and save harmless the Railroad from any and all costs, expense, loss or damage as a result of claims by the public or abutting landowners arising out of or connected with the viaduct project.

12. This agreement shall be binding upon and inure to the benefit to the parties hereto, their successors and/or assigns.

13. This agreement shall become effective only after its approval by the Illinois Department of Transportation and the Federal Highway Administration.

In Witness Whereof, the parties have caused this Agreement to be executed by their proper officers thereunto duly authorized the day and year first above written.

[Signature forms omitted for printing purposes]

Section 2. The City Clerk is directed to transmit two (2) certified copies of this ordinance to the Department of Transportation of the State of Illinois, through the District Engineer of District 1 of said Department of Transportation.

Section 3. This ordinance shall be in force and effect from and after its passage.

---

### Execution of Agreement Authorized with Chicago Union Station Co. for Rehabilitation of South Canal Street Viaduct.

The Committee on Finance submitted a report recommending that the City Council pass the following proposed ordinance transmitted therewith:

*Be It Ordained by the City Council of the City of Chicago:*

Section 1. That the Mayor be, and he is hereby authorized and directed to execute, the City Clerk to attest, the Commissioner of Public Works to approve, the City Comptroller to accept and the Corporation Counsel to approve as to form and legality, an Agreement between the City of Chicago and the Chicago Union Station Company, required for the construction of the Canal St. Viaduct, said Agreement to be substantially in the following form:

#### Agreement

This Agreement, made and entered into this ........day of ................, 19....., by and between the City of Chicago, a municipal corporation of the State of Illinois, hereinafter referred to as "City", and the Chicago Union Station Company, hereinafter referred to as the "Company",

Whereas, there now exists in the City of Chicago in Canal Street from Madison Street to Taylor Street an elevated viaduct and roadway thereto which is located over tracks of the Chicago Union Station Co., said viaduct having been constructed between 1922 and 1931 by Chicago Union Station Company, in accordance with the Union Station Company Ordinance adopted by the City Council of Chicago in March 1914.

Whereas, the existing viaduct is of such age and condition as to require its rehabilitation to handle present volume of vehicular traffic that the existing viaduct is incapable of handling; and

Whereas, the City and the Company being properly authorized, desire to enter into an agreement to accomplish the rehabilitation of the viaduct from Madison Street to Taylor Street in Chicago upon and subject to limitations, terms and conditions hereinafter set forth.

#### Witnesseth:

Now, Therefore, in consideration of the premises and the covenants and agreements hereinafter contained, it is agreed by and between the parties hereto as follows:

Section 1. The City agrees to perform the following work under this agreement, namely: Repair the deteriorated areas of sidewalk and roadways, renew or replace expansion joints, replace stairways at both Cabrini and Arthington Streets. Improve gutter grades for drainage. Seal the roadway surface with a waterproofing membrane, repair deteriorated steel handrail, patch the spalled areas of concrete on the underside of the deck, repair structural steel as necessary. Clean and paint exposed structural steel. All of the aforesaid work shall be performed in accordance with the terms hereinafter set forth and as shown on the general plan and specifications.

Section 2. No changes in such plans and specifications shall be made by the City without the written consent of the Company.

Section 3. The Company agrees to grant to the City permission for the storage on Company property of materials and equipment to be used in connection with the construction of the repair works.

Section 4. The City, at its expense, shall prepare the contract plans and specifications, advertise for bids, and construct or cause its viaduct project to be constructed in accordance with the aforesaid general plans.

Section 5. All work herein provided to be done which may affect the property, tracks or operation of the Company, shall be performed in such manner and at such times as shall be approved by the General Manager of the Company or their authorized representatives, and shall be performed in a manner so as to minimize interference with operations of the Company. The Company agrees that they will not unduly delay the City, its contractors or subcontractors performing said work. The City shall not permit any materials or equipment to be or remain closer than six feet from the nearest rail of any track and the City shall require this limitation from its contractors.

Section 6. The Company will furnish all material, labor and equipment required for the temporary and permanent relocation or adjustment of their facilities at this location which may be necessary to permit the performance of work covered herein.

Section 7. The Company shall keep accurate and detailed accounts of the actual costs and expenses as incurred by them, or for their accounts, in the performance of the work they herein agree to perform.



EXHIBIT
A

The Company, for performance of work hereof, may bill the City monthly for the costs and expenses incurred. These progressive invoices may be rendered on the basis of an estimated percentage of the work completed, and the City shall process ninety percent (90%) of each invoice within thirty (30) days after receipt of same.

The Company, upon completion of their work, shall render to the City detailed statements of the actual costs and expenses as incurred by them or for their account. After the City representatives have checked the progressive invoices and the final statement and they have agreed with the Company representatives that the costs are reasonable and proper, insofar as they are able to ascertain, the City shall promptly reimburse the Company for ninety-five (95%) per cent of the amount as agreed upon. Such reimbursements, however, are subject to the provisions of Section 9 hereof.

After the Federal or State representatives have audited the expenses as incurred by the Company, including such items of expense as may have been suspended from any previous payment, the City shall promptly reimburse the Company for the retained percentage and suspended items of expense, less the deduction of any item or expense as may be found by the Federal or State representatives as not being eligible for Federal reimbursement.

Section 8. The Company shall furnish flagmen and other suitable personnel to the City's contractors for flagging protection during the viaduct project. The Company shall have control and direction of said personnel during the progress of the work, but the City shall require its contractors to assume the entire risk and responsibility for said flagmen or other personnel. The City shall reimburse the Company for the cost of said flagmen or other personnel.

Section 9. It is understood that the project herein contemplated is to be financed from funds as appropriated by the Federal Government and expended under Federal Regulations. All agreements, plans, estimates, specifications, award of contracts, acceptance of work and procedure, in general, are subject to the Federal laws, rules, regulations, orders and approvals applying to it as a Federal Project; and the City will reimburse the Company as hereinabove provided, for only such items of work and expense, and in such amounts and forms as are proper and eligible for payment from Federal funds, and which have received approval by proper Federal authorities.

Section 10. The City shall require its contractors to indemnify and save harmless the Company, and its Proprietary and Tenant Railroad Companies operating in Chicago Union Station, from and against any and all liability, damages, costs and expenses for loss or damage to property whatsoever and injury to or death of persons whomsoever arising or growing, in whole or in part, out of or in connection with the performance of any of the work on the rehabilitation of said Canal Street Viaduct (from Madison to Taylor Streets) for the presence of any such property or persons on the premises of the Company at the site of said project, even though the operations of the Company, or its Proprietors or Tenants, may have caused or contributed thereto. The foregoing provisions of this Section shall not apply when such damages, costs and expense are caused by the sole negligence of the Company, its Proprietors or Tenants.

Section 11. The City further agrees to provide Company, its Proprietors and Tenants, Railroad Protective Liability Insurance providing for all damages arising out of bodily injuries to, or death of one person, and, subject to that limit for each person, as follows:

a) Bodily Injuries and Death Coverage
   Each Person            $ 5,000,000.00
   Each Occurrence        $10,000,000.00

b) Property Damage and Coverage
   Each Occurrence        $ 5,000,000.00
   Aggregate              $15,000,000.00

A copy of the policy or a certificate of insurance evidencing such coverage shall be furnished the Company before work is commenced.

Section 12. All utility facilities attached to the underside of Canal Street Viaduct from Harrison Street to Cabrini Street will be removed as required and not replaced, as they are no longer in service, and Company will arrange for such removal.

Section 13. That Standard Federal-Aid procedure and requirements and Illinois Commerce Commission orders and ruling shall apply to all phases of this project.

Section 14. This agreement shall be binding upon and inure to the benefit to the parties hereto, their successors and/or assigns.

Section 15. This Agreement shall become effective only after its approval by the Illinois Department of Transportation and the Federal Highway Administration.

In Witness Whereof, the parties have caused this Agreement to be executed by their proper officers thereunto duly authorized the day and year first above written.

[Signature forms omitted for printing purposes]

SECTION 2. The City Clerk is directed to transmit two (2) certified copies of this ordinance to the Department of Transportation of the State of Illinois, through the District Engineer of District 1 of said Department of Transportation.

SECTION 3. This ordinance shall be in force and effect from and after its passage.

On motion of Alderman Frost the foregoing proposed ordinance was *Passed*, by yeas and nays as follows:

*Yeas*—Aldermen Roti, Barnett, Kenner, Evans, Lathrop, Sawyer, Wilinski, Humes, Adduci, Vrdolyak, Huels, Kwak, Madrzyk, Burke, Jaksy, Barden, Shannon, Kellam, Kelley, Stewart, Stemberk, Lipinski, Rhodes, Marzullo, Zydlo, Ray, Washington, Cross, Hagopian, Keane, Gabinski, Mell, Frost, Laskowski, Aiello, Casey, Cullerton, Laurino, Gutstein, Pucinski, Natarus, Oberman, Simpson, Fifielski, Axelrod, Schulter, Volini, Saperstein, Stone—49.

*Nays*—None.

---

### Easement Agreement Authorized with The Belt Railway Co. of Chicago Necessary for Installation and Maintenance of Steam Lines to Northwest Incinerator.

The Committee on Finance submitted a report recommending that the City Council pass a proposed ordinance transmitted therewith, to authorize an easement agreement with The Belt Railway Company of Chicago necessary for the installation and maintenance of steam lines to the Northwest Incinerator.